Our next case is Teva Pharmaceuticals v. Eisai. I think Judge Rader suggests that we go ahead and get started, so why don't you begin? Certainly, Your Honor. May it please the Court, my name is Francis C. Lynch, and if this dispute was just about an abstract hypothetical question, then Eisai would have consented to judgment when we filed the D.J. action in the spring of 2008, and we would never be here. But like Forrest in Carrico, they are resisting vigorously the outcome we seek, and the delay that this could cause to generic entry would cost consumers hundreds of millions of dollars. To what extent does the 2003 statute amendment solve these problems? Well, certainly that the forfeiture provisions would address one possible scenario, but we're not there yet. At the moment, the injury is the absence of the ability to trigger exclusivity, which is necessary for FDA approval of the sale of the gate and the product. So I thought I understood that the 2003 amendments sort of eliminated this problem, or at least ameliorated it, and that you're not under that, so that those amendments might not be relevant to this case, but they exist, no? Well, Your Honor, as I understand it, the principal impact of the amendments that were not retroactive are the forfeiture provisions that come into play when there is an ability, patent-wise, for a first-to-file generic company to enter the market, but that company refrains from doing so for whatever reason. There's, I believe, a 75-day period or something of that sort. But that is not, I submit, the context in which we find ourselves here. This context has to be determined both at the time that the D.J. action was filed and at the time when the final judgment was entered in the district court in September of 2009. Well, speaking of that, I mean, if we're looking at the time the D.J. action was filed, what we're looking at is there's a preliminary injunction which seems to me arguably to have the same effect as the stipulation in Janssen. In other words, Teba and Gate can't launch their generic product. Why isn't that the end of the inquiry here? Well, because they're fundamentally different, Your Honor. The stipulation precludes any possible judgment on the compound patent, on that Risperidone 663 compound patent. There was no chance that that could be held invalid, and that was not any longer a barrier. Here, there remains a chance. It's not as great a chance as we had back in the spring of 2008 for reasons relating mostly to delay by ASI. And unfortunately, Judge Ackerman was not well. He subsequently died. I mean, there are a lot of circumstances, but it seems to me to be completely different to be facing a stipulation where you've given up your challenge and to have a pending challenge, which is exactly what was the case in the Carrico decision. The Carrico decision is on all fours in material respects with the case before you. Janssen was also on all fours at the time it was filed, but between the time it was filed and the time final judgment entered in the district court, there was the consummation, shall we say, of the stipulation. Well, let's assume by this time they had gone to trial in the 841 case, and Teva had lost, and there was a permanent injunction, not a preliminary injunction, in place with regard to the 841. Would that be sufficiently analogous to the stipulation in Janssen? I believe so, yes, Your Honor. To add one little point to that, of course, we all understand that in this particular ANDA setting, the preliminary injunction is access to the marketplace, and therefore the whole battle, in a sense. And so why wouldn't almost the same implications as a permanent injunction apply in the preliminary sense? Well, because of the fundamental difference between a preliminary and a permanent. Except that once you hit the market, the price drops, and it's never recoverable again. It's the whole battle. Well, the battle is waged when generics can enter the market. When you have this dual situation of a compound patent that's sued upon by the patent holder and other patents that are listed in the orange book but are not sued upon, are not alleged to be infringed in that original action, that's where you get to a situation where if you overcome that preliminary injunction, we tried to have a trial, in fact, in the spring of 07 to prevent what I feared and turned out to be the case, that the issues were just a little too complex for a paper-driven decision without even an oral argument. So the prospect of overturning a preliminary injunction, there's nothing terribly daunting about that. I mean, if you have a good, strong case, and we feel we have a very good, strong case, we have a pattern of conduct that's truly outrageous in terms of the violation of the duty of disclosure. We have highly material matters that were withheld. If we can get this to trial, we think we should win. And that would overcome the preliminary injunction issue. Well, in Carrico, the injury in Carrico is the delay of the approval of Carrico's ANDA. Isn't that the case? Yes. Well, the charges that lead to final approval, yes. And here, Teba's ANDA has been approved, right? Oh, Your Honor, I must draw a distinction between the two different products. Between GATE and Teba, okay. And for confidential reasons that are explained on page 7 of our opening brief, they're very different products. You're concerned about the GATE ANDA here? This is all about the GATE ANDA product, Your Honor. This does not involve the Teba product at all. And I have to emphasize, I'm sure the Court is aware of so many of these cases, but an ANDA, you don't just fill out a form. I mean, substantial resources are required to develop a formulation, to test it, and to put it in shape for approval. So it's a very different situation. Help me with something, which I must say I don't understand. I mean, I know that the Janssen opinion says this, but it strikes me as a bit odd that the 180-day exclusivity period could be triggered before the first generic would have the opportunity to market the product. Well, it goes back. I mean, is there authority for that other than Janssen? It just strikes me as extremely odd. Because that's what you're trying to do here, right, is you're trying to trigger the exclusivity period before the first generic could sell. Well, I mean, that is true, right? Well, if the words trigger, yes, it is true. But that was certainly the case in Carrico. In Carrico, IBEX had lost on the compound patent and was not sued on the DJ patents, the other patents in the Orange Book. And when Carrico brought suit, if it prevailed on the compound patent and it prevailed on the DJ patents, that would trigger that exclusivity before IBEX could have entered the market. It seems to me an odd situation, what was assumed in Carrico, what was stated in Janssen. It strikes me as extremely odd to be triggering the 180-day exclusivity period before the first generic can start selling the drug. I mean, is there some answer to that, what seems to me to be an odd situation? Why should it be triggered before they can sell? Well, Your Honor, all I can say is that that's a panel decision. It's controlling on you, and if Your Honor is having difficulty with the panel decision, I can't suggest a minor relief at this stage. That seems to be the best you can do, is to say we've decided rather than that it's right. There may be other avenues, you know, after this panel decides, but at the moment we have Carrico deciding there's injury in fact. It's traceable, same situations. It's redressable, same situations. It's right, same situation. It's not moved, same situation. Carrico, both at the time of filing of the suit and at the time that the judgment was entered in the district court, those Supreme Court dictated requirements for Article III, just disability, were satisfied. And that was what the Jansen court recognized a second time in a similar situation, was the case at the time that the Apotex DJ complaint was filed, but in the interim between that time and judgment, of course, the situation changed in a fundamental respect that was material and that court could have said, well, that doesn't make any difference, but the court didn't. And so that's what we have. We have Carrico. We have Jansen embracing Carrico up through that one distinguishing fact of the stipulation. The stipulation, I respectfully submit, is fundamentally different than a preliminary injunction that can be overturned just like the 30-month stay can be overturned by a judgment. I see that I'm at my rebuttal time. You want to keep your rebuttal time, Mr. Clinch? That will be fine. Thank you. Mr. Wexler? Good afternoon, Your Honor. May it please the Court. In addition to the preliminary injunction, which Your Honor pointed out, there's another circumstance in this case, which is that Teva has final approval from the FDA to sell generic Danefazil now. Well, not the Gates application. But what that means is that Teva could have, but for the injunction, Teva would have launched, and they tried to launch. And if you look at 8268, you see their interrogatory response describing their at-risk launch. What that would do is start the commercial marketing trigger. So in other words, without the injunction, Teva launches because it is a first filer with shared exclusivity, completely unlike Carrico. Teva launches, starts the FDA. If it were not for the injunction, Teva could have and was going to launch. Launch what? Generic Danefazil. But not the Gates product. But there's only one 180-day period, right? So Teva, if they had launched during the term of the patent, they would have started the 180 days. They were enjoined. Wouldn't the Rambax here, or the first generic here, still have an exclusivity period? The answer is they share exclusivity. Because of Teva's approach, it's a little complicated, but because of what Teva did, that clever strategy of filing the ANDA on the paragraph form of the basic compound patent, they share exclusivity, right? So if Teva launches, which they tried to do, but without the injunction. But that injunction is going to stay in place. It is, until the patent expiration. All I'm saying is there's an additional circumstance, which is they're enjoined. That injunction is equivalent to the stipulation because they can't launch now. If that injunction were not in place, they could have launched, started the 180 days. Let me ask you about the principle of shared exclusivity, which I have a little familiarity with. How does that work? If Teva launches and Rambax doesn't, and they have shared exclusivity of the 180-day period, what does that mean for another party? It starts the 180 days. For both of them, or just Rambax? There's one 180 days. Once it starts, it starts and it's gone. So if Teva triggered it, it would have started and it would have continued the 180 days. They would have started the commercial marketing.  But in order to trigger it, they'd have to start the marketing of the product that they say they don't want to market. Well, all they have to do is sell one tablet. They're not saying they don't want to market that. If you look at the interrogatory response, they had at-risk launch plans, and we were brought into preliminary injunction proceedings on the cusp of an at-risk launch. A268 lays it all out. All I'm suggesting is they could have started the trigger. The 180 days would go by. Unlike Carrico. Started the trigger how? By launching its product. All you've got to do is put one product. You do the commercial marketing. It starts the 180 days. They're different from Carrico. Couldn't do that because they were blocked by the 180 days. But they're enjoined. The DJ patents aren't blocking them from triggering the 180 days. They're not. What's blocking them is the injunction because they are a shared first file. It's a little complicated. The timeline and everything. But their theory is that they want to start the 180 days running earlier than the commercial launch. And they say that here, as in Carrico, they have the opportunity to start the 180-day period earlier. And they haven't. This isn't a situation where they've stipulated the validity of the patent, that here they may not succeed with respect to the first patent. But in Carrico, that was also true since the patent had already been upheld by this court. So they're saying that any uncertainty with respect to the first blocking patent is sufficient to distinguish this case from Janssen. So why isn't that true? Okay, so there's two pieces to that. First of all, in Carrico, as the second filer, if they had knocked out the basic compound patent but didn't DJ it, they still would have been blocked because they were a pure second filer. Totally unlike here. Here, the injunction stops them from going to market. If they could get to market, but for the injunction, they could trigger the 180 days. So the DJ patents aren't blocking. But I'm right, am I not, that in both this case and Carrico, there is ongoing litigation challenging that first patent. The answer— And which hasn't been finally resolved. Yes. There is ongoing litigation, but the consequences in terms of the 180 days and the way it plays out are completely different. Well, I don't understand why it's completely different. I mean, because Janssen said if there hadn't been a stipulation, this would be like Carrico. But this case has, under Medivine, all the circumstances, this case has circumstances of a shared first filer situation. So there's two hypotheticals. Okay, put that aside. Put the shared exclusivity aside. Would this case be more like Janssen or more like Carrico? This case is much more like Janssen. And if I—I'm trying to explain that there are two hypothetical situations. The situation now, which is the actual facts that are enjoined. The DJ patents aren't blocking them. They're enjoined. Under his hypothetical, where they somehow convinced this judge that when we had the burden of proof on inequitable conduct, to overturn that. If they overturned that, they still aren't blocked by the DJ patents. All they do is they put a tablet in and trigger the 180 days. Now, but I'm asking you to put that aside. Put that aside. Put the shared exclusivity aside. Put aside their ability to trigger the 180 day. But let's suppose that didn't exist. Why isn't this case like Carrico in the sense that there is litigation going on with respect to the first patent rather than a stipulation that there is no litigation? Because the shared exclusivity plays into the entire fundamental way this case plays out in terms of the injunction. The injunction is blocking them. Under Article III of the Constitution, we have to look, is there a real controversy? Are the DJ patents blocking them? And if not, if they get a resolution on the DJ patents, does it make a difference, right? Yeah, but it's not their sale. They're saying they want to trigger the start of the Rambaxi exclusivity period. Rambaxi is not enjoined, right? What they say is if we can get these patents held invalid, it will start the 180 day period. That's the injury. It's not that TIVA wants to be able to start selling the product. That's not the issue. What they want to do is to start the trigger of the 180 day period so after that's over with, they can sell. And the point is that the fact that all you want to do is trigger 180 days when no one can go to market, that goes directly contrary to the fundamental purpose of the Hatch-Waxman, the incentive structure of the Hatch-Waxman. If you look at 18 to 22 of their opening brief, they talk about the Hatch-Waxman framework. They don't even mention the 180 day incentive structure. The Disclaim patents, for example. Well, that was why I was asking the question about why is it that, I mean, do you agree that you can trigger the 180 day period before the first generic can market? No. I mean, that's what Jansen said, that if all you want to do is trigger at a time when no one can go to market to destroy the 180 day incentive structure, that's not an Article III controversy between AZI and TIVA. That's dissatisfaction with Hatch-Waxman. So what I'm saying is that in this case, there's an injunction in place. Let's assume this D.J. litigation arose after the 841 is expired. Would you have the same objections? In other words, there's no preliminary injunction in place, no? After the basic patent expires, Rambaxi can go to market. Rambaxi launches. No, I'm sorry. Let's assume Rambaxi doesn't launch. Well, but Rambaxi is free to launch. Yes, it's free to launch, but it doesn't. The free to launch doesn't trip wire trigger the 180 day exclusivity. It's actual launch, right? So you're talking about the basic compound is expired, Rambaxi doesn't launch, and then in the future they bring a D.J. No, and then TEVA brings its D.J., the same D.J. it has now on the four other patents. Honestly, I just don't know how that would come out. It's so different from now. I don't even know what the whole set of different arguments about what's going on. I know Janssen would have looked at it. Janssen, TEVA actually hadn't launched at the time of oral argument, so there was actually a delay, right? And this court said that from the time of the complaint to the judgment, there was no evidence that they weren't going to go to market. In Carrico, there was a 30-month stay that was blocking, not the D.J. patent. Why isn't the preliminary injunction just the same as that 30-month stay, putting this into the Carrico category? Two reasons. The 30-month stay in Carrico was an automatic temporary procedure that would have ended, according to everybody agrees, by 2008. The basic compound patent expired in 2012. The problem that the court was concerned about in Carrico was that if they had not brought the D.J. action on the separate patent, and let's say they knocked out the basic compound patent, they would still be blocked because they were a true second filer until 2012, even though that patent had been proven invalid under the way Hatch-Weinzman works. Contrast that with here. TEVA has shared exclusivity. If they knocked out the basic compound patent and go to market, they could start the 180 days, but they can't. They're enjoined until that patent expires. So there are two differences, two fundamental differences. One, it is a temporary automatic procedure that isn't tied to the patent term, whereas a preliminary injunction here, TEVA stipulated to infringement. They stipulated to patent validity, which was the paragraph 4 challenge. They have one inequitable conduct defense, which has no, was found to lack substantial merit, no appeal to this court. Well, we can't factor that in here. We don't have the documentation which we can adjudicate or come to a determination as to what the merits are of that other claim for another court. But we do have the court opinion, which found a preliminary injunction, recited the facts, and made the findings. But in Carrico, the patent had already been upheld by this court. I mean, talk about chances of success. The chances of success in a second validity attack on a patent that was upheld by this court have got to be pretty minimal, right? Two things. No, first of all, they're not going to make the same exact validity attack. That would be crazy, I mean, for a litigant to do that. But secondly, they're more privy than outbound. But I'm not talking about probability of success. And I'll try to explain this in terms of the way the 30-month stay would have worked. The basic patent expired in 2012 in Carrico. If they had knocked out the basic patent, the 30-month stay ended in 2008. Without the DJ, they would still be blocked, even though that patent had been invalidated. Because of this, they were a true second filer. In this case, Teva is the chair's exclusivity. The DJ patents aren't blocking them, irrespective of the patent. But isn't Teva a true second filer for its gate? Amber? They're both a first and second filer, and that has very significant consequences in the way the Hatch-Waxman plays out. By being a first filer, and that's why they did it, by being a shared first filer, they can go to market, trigger the 180 days with their first amendment, but for the injunction. That is very serious. Well, not now. What they want to do is to start the 180-day period going now, before they can sell. Right, and that's what Jan said. Because litigation takes a long time. Well, it's not that litigation takes a long time. They've determined that they're not going to be able to beat the patent. Remember, their DJ was brought four years after the P4s were filed. The DJ was brought in 2008 after they were enjoined. The paragraph 4s were in 2004. They brought the DJ in 2008 because what they recognized is that having not been able to beat the patent, now they just want to run out the rightful first filer. In this case, we've got 15 paragraph 3 filers with paragraph 4 certifications. Right? Is there a conflict here between Rambaxi and Teva? Between Rambaxi and Teva? Well, yeah. Teva just wants to run out its own 180 days in Rambaxi at a time when no one can go to market. And that goes right to the whole, you know, in terms of the incentive structure of Hatch-Waxman, because an early generic competition isn't about one particular end that one particular drug company likes better than their other end. What it's about is the overall competing goals. And the 180 days is part of that overall incentive structure. If you're Rambaxi and all these other generics are for paragraph 3, what does that mean for you when you file your paragraph 3 respecting the patent with paragraph 4 certifications? Well, the only effect on Rambaxi, the only effect here is that it's predicated on an assumption that Rambaxi is not going to trigger the 180 days exclusivity when it can, right? No. They're blocked by some other FDA action, right? In November, they will trigger. This November, they can launch and start. They can, but can isn't the question. The question is, will they? And we don't know whether they will, which is why Teva and Gate need to have it triggered in some other, you know, through the DJ process of these other patents. No, Your Honor. Teva's argument that we don't know whether they will is a new argument raised for the first summer appeal. What they want to do is they want to trigger it now so they don't have to wait 181 days when Rambaxi starts in November. Oh, but the record doesn't show whether they will or won't, does it? But that was the same thing in Janssen. Wait, trigger it now? I'm sorry. Trigger it now? I mean, this litigation is going to take some time. I mean, you know, the notion that this litigation would be complete by November 1910 or before November 1910, that's the only difference you're suggesting. No, I mean, they'll try. Obviously, they want to. I'm not sure what the timing should be like. I mean, we're here now, and whether it becomes moot in November because they launch or what have you is a different issue. What I'm saying is that their goal, and you heard it here, and it's in their brief, is they want to trigger it at a time when no one can go to market so the 180 days starts, so that Rambaxi can enjoy the 180 days, which from the very beginning it was supposed to. And that is contrary to what Hatch-Waxman is about. And it's different from Carrico. There are very special facts in this case. Well, Hatch-Waxman is designed to protect your patents from being challenged, right? Our patents, we completely face the challenge of the basic compound patent. We have 15 people who are waiting. So why haven't you given a stipulation here that you wouldn't sue on the patents, but they remain in the Orange Book? Why haven't they been pulled from the Orange Book? Because Teva sued the FDA and told the FDA, convinced the FDA that the FDA should not pull them from the Orange Book in order to preserve the 180 days of the first file. That's the Rambaxi-Levitt case and the case we gave in the supplemental submission. They sued the FDA to force them to leave it in the Orange Book to preserve the 180 days. And now, when they want to trigger the 180 days, they're telling you that they're being issued because it's being listed. I mean, it's a record. I see my time is up. Thank you. Thank you, Mr. Wexler. Mr. Lynch, you have a little over three and a half minutes. Thank you, Your Honor. First of all, I must confess I'm a golfer, so could have, would have, should have are concepts I'm familiar with. But here, it's not could have, would have, should have. It's what was the situation at the time the suit was filed? What is the situation at the time the district court entered a judgment? That's where a controversy is clearly present, and the Article III requirements are satisfied. To answer Judge Prowse's hypothetical, after the 8401 expires, the only way the D.J. action will have a vitality would be if it seems probable, or Ranbaxy has not entered the market, and it seems probable that they will be delayed. But TEVA, as the other side pointed out, TEVA can always launch and use up the 180-day exclusivity period. Well, as I've tried to explain, TEVA would much prefer, for confidential reasons, to launch the gate and— But what they say is all you have to do is sell one pill. I mean, is that true, that you could launch it basically for no cost, and that the effect of that is to start the running of the 180-day period? Well, I think what Your Honor is talking—what they're talking about is a complicated concept called a selective waiver. And here, that really isn't—as a practical matter, it isn't an option, because you talked about the possibility of Ranbaxy becoming adverse. We would expect, certainly, that in this shared exclusivity context, if TEVA sought to enter the market, that Ranbaxy would challenge that entry, even though TEVA had received final approval in April. What do you mean, challenge the entry? Well, it's a suit in the D.C. District Court to prevent the FDA from giving approval for marketing, or to revoke the approval. You see, you have to—in these situations, you have to plan long in advance in order to have a meaningful launch, and you want certainty. That's what this whole statute, Civil Action to Obtain Patent Certainty, is about. If TEVA has to wait until the day of expiration, and then face litigation with—the risk of litigation with Ranbaxy, that's not a certainty. What would Ranbaxy be contending? Let's assume that their hypothetical comes to pass, that you start very limited commercial marketing under the first amendment, and they say that would trigger the 180-day period. Are they correct about that, or are you saying that Ranbaxy would oppose that? I'm saying that I would expect that Ranbaxy would oppose it. I'm not an FDA law expert, but the shared exclusivity is complicated. It was always on a patent-specific basis. That's now changed. Everything about Hatch-Waxman is complicated, but what are we to do? I don't understand how we can take that into account in deciding the injury here, because we don't know what you're talking about. Well, you don't have to take that into account, Your Honor. All you've got to do is assess whether Carrico controls. Carrico does control. There's standing. There's ripeness, and there's not moot. And when those three things are present, then Carrico controls, and we have a controversy, and whatever is going to happen in this complicated framework can be sorted out by the district court on remand. Thank you, Mr. Lynch.